1

2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

3
_____

UNITED STATES OF AMERICA,

4
                                Case No. 1:17-cr-103
                Plaintiff,                (LJV)

5
vs.                             January 21, 2020

6

DALVON CURRY, a/k/a Dale, a/k/a Dalo,

7
                Defendant.

8
_____

9

**TRANSCRIPT EXCERPT OF CROSS-EXAMINATION OF HAKEEM HUMPHREY**
10
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

11

12
APPEARANCES:          JAMES P. KENNEDY, JR.
                      UNITED STATES ATTORNEY
13                    BY: PAUL C. PARISI, ESQ.
                          SETH T. MOLISANI, ESQ.
14                    Assistant United States Attorneys
                      Federal Centre
15                    138 Delaware Avenue
                      Buffalo, New York 14202
16                      and
                      UNITED STATES DEPARTMENT OF JUSTICE
17                    BY: CHRISTOPHER O. TAYLOR, ESQ.
                      Trial Attorney, Organized Crime Gang Unit
18                    1301 New York Avenue, NW
                      Washington DC 20005
19                    For the Plaintiff

20                    LAW OFFICES OF KEVIN W. SPITLER
                      BY: KEVIN W. SPITLER, ESQ.
21                    181 Franklin Street
                      Suite 300
22                    Buffalo, New York 14202
                      For the Defendant Dalvon Curry

23
     PRESENT:          KATHERINE M. REBISZ, Paralegal
24                    STEVEN P. DONNELLY, FBI Special Agent

25
     COURT SECURITY:   OFFICER PATRICK J. CORONA

| 1 | <u>LAW CLERK:</u> | ALLISON P. GIOIA, ESQ. |
|---|---|---|
| 2 | <u>DEPUTY CLERK:</u> | COLLEEN M. DEMMA |
| 3 | <u>COURT REPORTER:</u> | ANN M. SAWYER, FCRR, RPR, CRR, |
| 4 | | NYRCR, NYACR, Notary Public<br>Robert H. Jackson Courthouse<br>2 Niagara Square |
| 5 | | Buffalo, New York 14202<br>Ann_Sawyer@nywd.uscourts.gov |

1              (Excerpt commenced at 2:24 p.m.)

2              (Jury present.)

3

4    **H A K E E M   H U M P H R E Y**, after being duly called and

5    sworn, testified as follows:

6              THE COURT:  Mr. Spitler?

7              MR. SPITLER:  Thank you, Judge.

8              **EXAMINATION BY MR. SPITLER (CROSS):**

9    Q.  Mr. Humphrey, when you first arrived in the Towne

10   Gardens, you said it was sometime in what, 2014?

11   A.  Yes.

12   Q.  And then within a couple of months of your arrival, you

13   said you arrived in summer of 2014, it would be within a

14   couple months, you were selling marijuana in the Towne

15   Gardens Plaza, correct?

16   A.  Yes.

17   Q.  And you had become friends with other members who --

18   other people who reside in the Towne Gardens, correct?

19   A.  Yes.

20   Q.  And those individuals allowed you to sell drugs; is that

21   correct?

22   A.  Yes.

23   Q.  Is that what you're telling us?  Yeah.  Who?  Who?  Like,

24   who was the boss?

25   A.  To my understanding, there's no boss.

1    Q.  No boss.  Who were the second -- if there's no boss,

2    who's second in command?  Nobody, right?

3    A.  Nobody.

4    Q.  Oh.  And you talked -- I think at one time you said hey,

5    you know, if somebody came to you to buy marijuana, you --

6    and you were out, you would say, well, go see one of the

7    other guys that sells in the Gardens, right?

8    A.  It was nothing never about other drugs.

9    Q.  How about marijuana?  If somebody came to you to buy

10   marijuana, you were out, would you send them to another

11   marijuana seller in the Garden?

12   A.  Yeah.

13   Q.  Because you want to keep the money then, right?

14   A.  Yeah.

15   Q.  Okay.  But there was no written agreement, nobody in

16   charge saying, hey, if you don't have any, you've got to send

17   it to this guy, not that the guy, right?  There was nobody in

18   control?

19   A.  Yeah, nobody in control.

20   Q.  You were all independent contractors, weren't you?  All

21   working your deals, right?

22   A.  Yes.

23   Q.  I think you told us you would have been 14 when you came

24   to the Towne Gardens, correct?

25   A.  Yes, that's correct.

1  Q.  Okay.  And you said you had been a member of the group on

2  Schuele Street, a gang, correct?

3  A.  Yes.

4  Q.  It was a Schuele Street gang.  So how old were you when

5  you joined that gang, 12, 13?

6  A.  13 maybe, yeah.

7  Q.  13?  Okay.  So you're with a group in Towne Gardens, and

8  you, you know, you're telling us that's BFL, and you told us

9  about the older guys.  The BFL.  You were never a member of

10 BFL you told us?

11 A.  Never.

12 Q.  But you said my client was, right?

13 A.  Yes.

14 Q.  Now the BFL guys, some of them had that tattoo right on

15 their stomach, didn't they?

16 A.  Yes, they did.

17 Q.  Who?

18 A.  I can't remember right now.

19 Q.  More than one of them?

20 A.  Yes, more than one of them.

21 Q.  My client didn't have that tattoo, did he?

22 A.  No, he don't.

23 Q.  No.  And I think you told me my client didn't sell drugs

24 either?

25 A.  He didn't, no.

1    Q.   No.  And did he live in Towne Garden?

2    A.   No, he didn't.

3    Q.   Okay.  Now, you told us about in the summer of 2015, I

4    think that's when you were gambling with some guys at JFK

5    Park when somebody comes up and starts shooting at you guys,

6    right?

7    A.   Yes.

8    Q.   And although you said you couldn't see the face of the

9    individual that shot at you, you knew that individual was

10   Jaquan Sullivan?

11   A.   Yes, I did.

12   Q.   And as a result of that, you, along with some others,

13   went looking for Mr. Sullivan?

14   A.   Yes.

15   Q.   Yep.  And your purpose in going to do that -- were you

16   armed --

17   A.   Yes, I was.

18   Q.   -- with a weapon?

19        And your purpose in going to do that was you were

20   intending to shoot Mr. Sullivan, didn't you?

21   A.   Yeah.

22   Q.   Right.  And so your idea was I'm going to shoot Sullivan.

23   And you realized if you shot him, you could kill him, right?

24   A.   Yeah.

25   Q.   Right.  But you didn't care if you shot and killed him,

1  that was okay with you, right?  Because he had shot at you,

2  right?

3  A.  Yes.

4  Q.  Okay.  Right.  Now, you told the government that, didn't

5  you?

6  A.  Yes, I did.

7  Q.  And you're not being prosecuted for that, are you?

8  A.  No.

9  Q.  No.  And that's attempted murder, isn't it?

10  A.  No, it's not.

11  Q.  Well -- it's not?

12  A.  No.

13  Q.  You mean, if you shoot at somebody and try to kill them,

14  and you miss them, it's not attempted murder?

15  A.  Nobody was never hit.

16  Q.  Right.  Right.  Oh, I'm sorry.

17     So the fact that you missed him, it really isn't a crime,

18  right?  Right?  That's your position?

19         MR. PARISI:  Objection, Your Honor.  Asking for a

20  legal conclusion.

21         THE COURT:  Overruled.

22         BY MR. SPITLER:

23  Q.  Right?  You didn't do anything wrong because you missed

24  him, right?

25  A.  I didn't say that.

1    Q.  Oh, I'm sorry.  But you told the government that, and the

2    government said don't worry, we're not going to prosecute you

3    for whatever you may have done that day, right?

4    A.  Yeah, under a proffer agreement.

5    Q.  Proffer agreement, that's right.

6        So basically what happens is, you, under the proffer

7    agreement, you got your attorney, he's helping you, right?

8    A.  Yeah.

9    Q.  You've got an attorney sitting right there when you're

10   talking to the government, right?

11   A.  Yes.

12   Q.  And what happens in the proffer is the government says

13   tell us what happened, we won't prosecute you, right?

14   A.  Yes.

15   Q.  I think you told us when being asked by Mr. Parisi about

16   who you saw selling drugs, and you listed Larell Watkins.

17   You told us that he sold marijuana, heroin and crack,

18   correct?

19   A.  Yes.

20   Q.  And you saw him every day doing this?

21   A.  Yes.

22   Q.  And you told us that Maurice Rice, he would sell crack

23   and heroin, and he would sell it every day, right?

24   A.  Yes.

25   Q.  And you told us that GB, that's Shameris Washington, he

USA v Curry - Humphrey - Spitler/Cross - 1/21/20

9

1  sold heroin, and you'd see him doing that, right?

2  A.  Yes.

3  Q.  And Miquise Jones, he was selling heroin and -- heroin

4  and crack, and you saw him doing that on a daily basis also?

5  A.  Yes.

6  Q.  Okay.  And Markel Green, who you called Dolo, he was BFL

7  but he was a weed seller, right?

8  A.  Yes.

9  Q.  Like you, in the plaza?

10  A.  Yes.

11  Q.  Right?  Okay.  And then Chris Henry, he was a -- was he

12  BFL, Chris Henry?

13  A.  CBL.

14  Q.  CBL, a little bit older.  And he was selling crack.  And

15  did you ever see him do that?

16  A.  Yes.

17  Q.  Okay.  And I think you told us that 90, Larquan Watkins,

18  he was a crack and heroin dealer, correct?

19  A.  Yes.

20  Q.  Not only did he sell to individuals, but he also supplied

21  other people?

22  A.  Yes.

23  Q.  And you'd see him do that as well?

24  A.  Yes.

25  Q.  And all these people that were engaged in this criminal

1    activity, they were okay with you being around watching them

2    engage in this criminal activity, right?

3    A.   Yeah.

4    Q.   Because you were trusted, right?

5    A.   Yes.

6    Q.   But you weren't a member of BFL?

7    A.   No, I was not.

8    Q.   How does somebody become a member of BFL?  Is there like

9    an initiation?  How does that work?

10   A.   I don't know, you would have to ask the members of BFL.

11   Q.   Well, you were around a lot of them.  You mean, you never

12   saw anybody get into BFL?

13   A.   No.

14   Q.   So when you arrived in 2014, everybody that's in BFL is

15   in BFL; is that your testimony?

16   A.   Yes.

17   Q.   Okay.  And from 2014 up until 2018, you never see anybody

18   else join BFL; is that correct?

19   A.   '17.

20   Q.   '17, you never see anybody else join BFL?

21   A.   No.

22   Q.   I remember you telling Mr. Parisi on direct examination

23   that you didn't ask questions, you would just kind of stand

24   there and take in what was being said, right?

25   A.   Yeah, a listener.

1    Q.  You were a listener, right.

2        You know, when you went out looking for Mr. Sullivan and

3    he started shooting at you, because he saw you coming, right?

4    A.  He didn't see me.

5    Q.  Jaquan didn't see you?

6    A.  He didn't see me.

7    Q.  No?  Who did he see?

8    A.  He seen Maurice and GB, he didn't see me.

9    Q.  Because you weren't there?

10   A.  I was there.  He didn't see me, though.

11   Q.  How -- how do you know that?

12   A.  Just my guess.

13   Q.  Your guess?  Okay.

14       Now, on that particular occasion, because on one occasion

15   you had a gun and you shot at Sullivan, correct?  On this

16   occasion, did you have a gun?

17   A.  It's the same occasion.

18   Q.  Same occasion.  Okay.  So he didn't see you.  But he

19   didn't shoot it at the group you were in?

20   A.  He shot at the car.

21   Q.  Yeah.  Who shot first?

22   A.  Sullivan.

23   Q.  Sullivan?  Now you were asked about the December 5th,

24   2015 shooting and Mr. Sullivan's death, and you said you

25   learned about that on a Facebook post.

USA v Curry - Humphrey - Spitler/Cross - 1/21/20

12

```
 1   A.  The death, yes.

 2   Q.  His death, yes, okay.

 3       You then said maybe about a week later, you were around

 4   in of the buildings at the Towne Garden --

 5   A.  Two weeks.

 6   Q.  -- huh?

 7   A.  Two weeks.

 8   Q.  Two weeks?  Two weeks.

 9       -- and you were in a building in the Towne Garden, and

10   you said that my client admits to you and some others that he

11   shot Mr. Sullivan, right?

12   A.  Yes.

13   Q.  And he tells this story that Sullivan came up, made some

14   threatening comments, and starting shooting at him, right?

15   A.  I didn't say he started shooting.

16   Q.  You didn't?

17   A.  No, I said he shot one time.

18   Q.  Oh, he shot one time?

19   A.  Yeah.

20   Q.  And then I think you told us that my client told you that

21   he shot him, and shot him in the chest five times, right?

22   A.  Yes.

23   Q.  You remember that number, right?

24   A.  Yeah, it's significant.

25   Q.  Okay.  Did you ever find out how many times Mr. Sullivan
```

1   was shot in the chest, sir?

2   A.  No.

3   Q.  Okay.  Maybe we'll find that out later.

4           MR. PARISI:  Objection.

5           THE COURT:  Overruled.

6           BY MR. SPITLER:

7   Q.  Who's Flock?

8   A.  I don't know him.

9   Q.  Who's Lil D?

10  A.  Dalvon friend.

11  Q.  But you don't -- although you've heard that name, that

12  name -- you don't connect either one of those names with a

13  person, correct?

14  A.  I knew Lil D.

15  Q.  What's Lil D's name, do you know?

16  A.  No, I don't.

17  Q.  Okay.  Now, you indicate that you saw my client with a

18  gun after the Sullivan shooting.  You said you saw it on his

19  hip, correct?

20  A.  Before, not after.

21  Q.  Before.  And then -- and then after, you saw that gun one

22  more time; is that correct?

23  A.  Yes.

24  Q.  And you believed it to be the same gun?

25  A.  I knew it was the same gun because I seen it before.

USA v Curry - Humphrey - Spitler/Cross - 1/21/20

14

```
 1  Q.  So are you saying that gun was so unique it was the only

 2  gun that could have looked like that?

 3  A.  And from other comments that was around when I seen the

 4  gun again.

 5  Q.  Well, you saw it with -- I think you told us Laron?

 6  A.  Yes.

 7  Q.  Did you see -- is it your testimony that my client gave

 8  that gun to Laron?

 9  A.  I don't know how Laron got the gun.

10  Q.  And obviously you don't know when he got it.  You don't

11  know how he got it and you don't know when he got it?

12  A.  No.

13  Q.  Now on another occasion you're walking to -- I think to

14  the liquor store on Jefferson, right --

15  A.  Yes.

16  Q.  -- with a bunch of others, and somebody drives by and

17  shoots at you, right?

18  A.  Yes.

19  Q.  You don't know who that is?  Or do you?

20  A.  No, I don't.

21  Q.  Car didn't look familiar to you?

22  A.  No.

23  Q.  Let's move on to New Year's Eve.

24          MR. SPITLER:  And we need to bring up -- so can we

25  bring up 46.16, page 7, please?
```

1          BY MR. SPITLER:

2    Q.  Okay.  Now this is in evidence, you've already testified

3    about to this.

4        You told us on direct examination that your cousin was

5    not -- he was just a -- let me see here.  He wasn't a drug

6    dealer, he wasn't a gun guy, he didn't -- wasn't a violent

7    guy at all, right?

8    A.  Absolutely.

9    Q.  Okay.  If you go down that post, you'll see that on

10   Saturday at 1:39, that's your cousin saying to my client, you

11   can't come to the town, right?

12   A.  Yes.

13   Q.  So your client -- why is your client telling my client

14   that?

15          MR. PARISI:  Objection, speculation.

16          THE COURT:  Sustained.

17          MR. SPITLER:  Okay.

18          THE COURT:  And to the form of the question, as well.

19          MR. SPITLER:  Okay.

20          THE CLERK:  Try again, Mr. Spitler.

21          BY MR. SPITLER:

22   Q.  But you see what he says.

23   A.  Yeah, I see what he says.

24   Q.  Okay.  And how do you interpret that?

25   A.  I don't know.  I blow it off.

1   Q.  Okay.  And you see my client's response, I'm a grown ass

2   man, right?

3   A.  Yeah.

4   Q.  And then your client -- and then your cousin -- by the

5   way, I know you said he's your blood cousin.  So is he a

6   first cousin of yours?  Were your parents brothers and

7   sisters?

8   A.  Second.

9   Q.  Okay.  Second something, okay.

10      It says you shook to touch down, and it's got some emojis

11  there.  I think those are crying faces, aren't they?

12  A.  Laughing.

13  Q.  Huh?

14  A.  Laughing.

15  Q.  Is it laughing?  Laughing.  Okay.

16      Your interpretation of you shook to touch down?

17  A.  Scared to come back.

18  Q.  So, why is your cousin engaged in this conversation?

19          MR. PARISI:  Objection, speculation.

20          THE COURT:  No, overruled.

21          BY MR. SPITLER:

22  Q.  Do you know?

23  A.  No, I don't.

24  Q.  Okay.  And then response by Mr. Curry, if you actually

25  think that, you could suck one, and whatever think that too.

1   And then there's an emoji that appears to be sunglasses on.

2       What's the significance, as you understand it, an emoji

3   with sunglasses, do you know?

4   A.  Cool.

5   Q.  Okay.  And now your cousin says stop talking like you

6   tough, with a couple exclamation points.  I'll make you pick

7   yo gun back up lil boy, exclamation point.  You soft as hell,

8   exclamation point.

9       Did you know why your cousin -- did you ever talk to your

10  cousin?  Do you know why he's saying these things?

11  A.  No, I don't.

12          MR. SPITLER:  Okay.  Could we go to 46.93, please.

13          BY MR. SPITLER:

14  Q.  This is the hallway you've testified about before.  The

15  stairway that we're looking at, there appears to be a

16  stairway on the other side of the building; is that correct?

17  A.  Yes.

18  Q.  The stairway that we're looking at, would this have come

19  in -- would this -- this is the stairway where you were

20  looking out the window, correct?

21  A.  Yes.

22  Q.  And would that be the considered the front of the

23  building or the back of the building?

24  A.  I don't know would it be -- what it would be considered.

25  Q.  Okay.  But in any event, you indicated on your direct

1    examination that this photograph shows your viewing point as

2    you look up that stairway to that landing, and remember you

3    marked where you saw your cousin hit him with the bottle,

4    right?

5    A.  Yes.

6    Q.  Now, as he approached -- as your cousin approached my

7    client, did he say something to my client?  Like, I'm gonna

8    hit you?  Or you're a punk?  Or you're soft as hell?  Did he

9    say anything, or did he just hit him?

10   A.  That I remember, he just hit him.

11   Q.  Just hit him.  Commonly referred to as a sucker hit, a

12   sucker punch, right?  You don't see it coming.  That's what

13   happened to you, right, in that video?  You get sucker

14   punched, didn't you?

15       You're talking to the one guy and the other dude comes up

16   and sucker punches you, doesn't he?

17   A.  Absolutely.

18   Q.  Huh?  Absolutely.  So they're both sucker punches, right?

19   A.  I guess, if you want to say that.

20   Q.  I do.  You don't -- you disagree?  Is that your -- you

21   have to give me an answer.  Do you disagree, or not?

22   A.  No, I don't disagree.

23   Q.  Okay.  Thanks.  So we know you're looking out --

24       MR. SPITLER:  Can we go to 46.127, I'm sorry, 125.

25   Pardon me.

1            BY MR. SPITLER:

2  Q.  All right.  Now, this is the window that you were looking

3  out.  And just so I'm clear, the only windows that open are

4  these rectangular ones, the four rectangular ones, correct?

5  The lower one and the upper one, that's a permanent -- that's

6  permanent, correct?

7  A.  Yes.

8  Q.  As we're looking at these four windows from right to

9  left, you were looking out the window farthest to the right,

10 weren't you?

11 A.  Yes.

12 Q.  Could you mark the one you were looking out?  Right here?

13 Okay.  And how far out the window were you leaning when you

14 were looking?

15 A.  From of my chest, up.

16 Q.  Chest, up.  Okay.

17          And now if we go to -- so, when you talked about the

18 sidewalk on direct examination, this is the sidewalk that we

19 see partially obscured by the frame of the window, correct?

20 Not the -- not the sidewalk that's headed off towards the

21 other building that Ts in some of the sidewalks, correct?

22 A.   It's the one that's going to the right.

23 Q.  Yeah.  Could you just draw your finger down the sidewalk

24 that you -- right.  Okay.

25          MR. SPITLER:  So now can we go to 46.127.

1          BY MR. SPITLER:

2    Q.  All right.  So now you'd agree with me --

3          MR. SPITLER:  Can we clear those marks, please?

4    Thank you.

5          BY MR. SPITLER:

6    Q.  So you're leaning out, and you talked about that dark

7    spot where there was a tree.  And your testimony is, is that

8    you could see the Jeep, the burgundy-colored Jeep leaning out

9    that window despite the presence of that tree; that's your

10   testimony, isn't it?

11   A.  Yes, it was a small tree.

12   Q.  I see.  Okay.  And I don't see any streetlights around

13   that white car.  This was after midnight on January 1st of

14   2017.  It was dark, wasn't it?

15   A.  Yes, it was.

16   Q.  Your testimony is you could see something past?  That's

17   your testimony?  You could see something past?

18   A.  Yeah, I could see.

19   Q.  Which side of the car were they on?

20   A.  On the right side.

21   Q.  Driver's side or passenger's side?

22   A.  Driver's side.

23   Q.  Driver's side.  Okay.  And you saw your cousin walking

24   down that sidewalk towards that car?

25   A.  I never said he was walking down the sidewalk.

1    Q.  Well, he's walking on the grass?

2    A.  Yes.

3    Q.  Oh, okay.  And you said he was limping?

4    A.  Yeah, he was limping.

5    Q.  Um-hum.  And from your vantage point, well, e you said

6    that you saw -- that you saw my client and Mr. Watkins,

7    Larell Watkins, at the burgundy Jeep, right?

8    A.  Yes.

9    Q.  So they were already at the Jeep as your cousin limped

10   down the grass towards the Jeep?

11   A.  Yes.

12   Q.  So they got out of the building before your cousin got

13   out of the building?

14   A.  Yes.

15   Q.  Prior your testimony, have you had an opportunity to

16   review your prior statements to the police as well as the

17   grand jury?  Did you look at what you had said under oath

18   previously?

19   A.  No.

20   Q.  Do you recall, you talked about the statements you gave

21   on January 31st, 2017, correct?

22   A.  Yes.

23   Q.  And in that statement, you were not truthful, correct?

24   A.  Correct.

25   Q.  You know, in that statement do you remember you were

1  asked if you had spoken with either my client or Larell since

2  Xavier was killed, and you said no; do you recall that?

3  A.  Yes.

4  Q.  And that wasn't true, was it, because you told us that

5  you did, stood around while you claim my client admitted to

6  the shooting, right?

7  A.  I never say he admitted to no shooting of Xavier.

8  Q.  Okay.  But you never talked to him either?

9  A.  No.

10  Q.  Okay.  You were -- you had indicated that it was, to the

11  best of your recollection, ten to 15 minutes that my client

12  and Mr. Larell Watkins were at the Jeep; that was -- that was

13  your best guess, correct?

14  A.  Yes.

15  Q.  Okay.  And where was your cousin during that time?

16  A.  In Ms. Felicia house.

17  Q.  Okay.  And you said that Steve was trying to help you, or

18  at least initially helped your cousin, correct?

19  A.  Correct.

20  Q.  Okay.  That's Steve Major, right?

21  A.  Yes, that's correct.

22  Q.  After your cousin ended up in her apartment, where did

23  Mr. Major go?

24  A.  I don't recall where he went.

25  Q.  Did he come and stand next to you at the window?

1    A.  No, he didn't.

2    Q.  You're aware that a number of people from the Towne

3    Gardens were initially charged in this case, correct?

4    A.  Yes.

5    Q.  14 of them, right?

6    A.  I don't remember.

7    Q.  But you know, for instance, Michael Walker was charged,

8    right?

9    A.  In this case?

10   Q.  Yeah.

11   A.  No, I wasn't sure of that.

12   Q.  Okay.  How about Maurice Rice?

13   A.  He wasn't there, neither, so how would he be charged?

14   Q.  No, no, no, I mean in this particular case.  People in

15   this conspiracy.  You're aware that certain members of the

16   BFL were charged in this case, correct?

17   A.  Yes.

18   Q.  Did you know one of them was Mr. Rice?

19   A.  Yes.

20   Q.  Did you know one of them was Larell Watkins?

21   A.  Yes.

22   Q.  Okay.  And those individuals were the people that you

23   told us were people that you associated with on a daily basis

24   in your time living in Towne Garden, correct?

25   A.  Correct.

1  Q.  And you indicated that you didn't see my client around

2  Towne Garden a lot, did you?

3  A.  I never said that.

4  Q.  You never -- oh, well, did you see him around a lot?

5  A.  Yes, I did.

6  Q.  Okay.  And in 2015 into 2016, where was he living in the

7  Towne Garden?

8  A.  He wasn't living in the Towne Gardens.

9  Q.  Okay.

10  A.  To my understanding, he wasn't even in Buffalo.

11  Q.  Okay.  So he wasn't physically, to the best of your

12  knowledge, he wasn't physically around Towne Garden.

13  A.  Absolutely.

14         MR. SPITLER:  Just a second.  A moment, please,

15  Judge.

16         THE COURT:  Mr. Spitler, would this be a good time to

17  take a break?

18         MR. SPITLER:  I've got a few more questions.

19         THE COURT:  Go ahead.

20         MR. SPITLER:  46.126, please.  Can we try 27 now?  I

21  want the view towards the white vehicle.  Yes, thank you.

22         BY MR. SPITLER:

23  Q.  Okay.  So here's the area again, looking at 46.127.  And

24  we see the white car was where the Jeep was.  So you said

25  after -- after the shots were fired, you saw my client run,

1   correct?

2   A.  Correct.

3   Q.  Now, you're familiar with this area, so you know as we

4   look behind these vehicles, that's the plaza, isn't it?

5   A.  Yes.

6   Q.  And that's north -- that's in a north direction, correct?

7   Northerly?  If you know.

8   A.  Yeah.

9   Q.  And you indicate that my client ran to the left in this

10  picture, and that would be towards --

11  A.  Hickory Street.

12  Q.  -- Hickory, right?

13          MR. SPITLER:  Thanks.  That's all I've got.  You can

14  take that down, thank you.

15          THE COURT:  Redirect?

16          MR. PARISI:  Yes, Your Honor.

17          THE COURT:  How long do you think you'll have?

18          MR. PARISI:  Five minutes.

19          THE COURT:  Okay.

20          **EXAMINATION BY MR. PARISI (REDIRECT):**

21  Q.  Mr. Humphrey, just a few things I'd like to clear up.

22  Mr. Spitler asked you if you've reviewed prior statements.

23  You have reviewed your grand jury testimony, correct?

24  A.  Yeah, the grand jury testimony.

25  Q.  Were you just confused when he asked you about reviewing

USA v Curry - Humphrey - Parisi/Redirect - 1/21/20

26

1  prior statements?

2  A.  Yes.

3  Q.  Okay.  But you have reviewed your grand jury statements

4  and your statements to the police, right?

5  A.  Yes.

6  Q.  A few things I'd just like to clarify.  You said that --

7  Mr. Spitler asked you about times that you saw Dalvon Curry

8  in the Towne Gardens versus times you believed him to be out

9  of town.  And I think on direct examination -- well, let me

10  just ask you.

11      After -- prior to the Jaquan Sullivan shooting, was

12  Dalvon Curry a person that you saw in the Towne Gardens just

13  about every day?

14  A.  Prior to it?  Yes.

15  Q.  Following that shooting, did there come a time when you

16  did not see Dalvon Curry as much?

17  A.  Yes.

18  Q.  Is that the time you believed him to be out of Buffalo?

19  A.  Yes.

20  Q.  The statements that you heard with respect -- that Dalvon

21  Curry made to you with respect to shooting Jaquan Sullivan,

22  when did those occur in relation to when Jaquan Sullivan was

23  killed?

24  A.  A week or two later.

25  Q.  While he was still in Buffalo?

1   A.  Yes, while he was still in Buffalo.

2   Q.  Well before Xavier Wimes was killed?

3   A.  Yes.

4   Q.  Is it more beneficial for you to tell the truth or to

5   lie?

6   A.  To tell the truth.

7   Q.  Why is that?

8   A.  So I won't be prosecuted for the stuff I told y'all.

9   Q.  Because then anything you said can be used against you?

10  A.  Yes.

11  Q.  If someone other than Dalvon Curry fired the gun at

12  Xavier Wimes, would you tell us?

13  A.  Yes.

14          MR. PARISI:  Nothing further, Your Honor.

15          MR. SPITLER:  I just have to ask.

16          THE COURT:  No, no, that's okay.  Go ahead.

17          **EXAMINATION BY MR. SPITLER (RECROSS):**

18  Q.  Not only did you review your grand jury testimony and

19  your statement to the police on January 31st of 2017, but you

20  also reviewed your proffer agreement, didn't you?  That

21  proffer agreement that you read over?

22  A.  No, I don't mean seeing that.

23  Q.  Do you remember, it says -- do you remember in the second

24  paragraph it says, however, this is your proffer --

25          MR. PARISI:  Objection, Your Honor.  Improper

1    impeachment.  Reading from a document not in evidence.

2              MR. SPITLER:  Okay.  I'll -- can we bring up just for

3    the witness, please, 3566.05.

4              BY MR. SPITLER:

5    Q.  Please take a look at that document.  Can we go to the

6    second page.  Let me know when you're finished looking at the

7    second page?

8         And the third page now, please.  Is that your signature

9    on that page, sir?

10   A.  Yes, it is.

11   Q.  Dated June 7th of 2018?

12   A.  Yes.

13             MR. SPITLER: Can we go back to the first page, please?

14             BY MR. SPITLER:

15   Q.  Do you see in the paragraph 2, did you read that -- can

16   you read that paragraph again to yourself?

17        You read it over, right?

18   A.  Yes.

19   Q.  Yes?  And that paragraph indicates that the government

20   has the sole discretion to determine whether or not you're

21   telling the truth, doesn't it, right?

22   A.  Yeah.

23   Q.  So it's not when you -- when the government says they

24   think you're telling the truth, right, then we'll give you

25   the benefit of the doubt?

1          MR. PARISI:  Objection, Your Honor.  Calls for

2    speculation as to what other individuals believe.

3          THE COURT:  I'll sustain the objection to the form of

4    the question, but not -- not the objection he made,

5    Mr. Spitler.  You can ask that question.

6          BY MR. SPITLER:

7    Q.  So, it's up to the government to decide if you're telling

8    the truth, isn't it?

9    A.  That's not to my knowledge.  I was asked what --

10   Q.  Do you disagree with me that it says that the government

11   has the sole discretion in evaluating the information and

12   tangible objects that you're given to them?

13   A.  It says that.

14   Q.  Right.  So it's the government that decides whether or

15   not you're telling the truth, right?

16   A.  Yeah, I guess.

17         MR. SPITLER:  All right.  Thanks.  You can take it

18   down.  Thank you.

19         THE COURT:  Anything else?

20         MR. PARISI:  May have I just have one moment, Your

21   Honor, please?  Nothing further, Your Honor.

22         THE COURT:  Okay, you can step down.

23         (Witness excused at 3:04 p.m.)

24         (Excerpt concluded at 3:04 p.m.)

25              *     *     *     *     *     *

1                          CERTIFICATION

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                         s/ Ann M. Sawyer

                          Ann M. Sawyer, FCRR, RPR, CRR,
10                        NYRCR, NYACR, Notary Public
                          Official Reporter
11                        U.S.D.C., W.D.N.Y.

12

13

14

15

16

17

18

19

20

21

22

23

24

25